SAN FRANCISCO ASS'N FOR BLIND v.
INDUSTRIAL AID FOR BLIND, Inc.

No. 2530.

District Court, E. D. Missouri, E. D.

Feb. 13, 1945.

John H. Cassidy, of St. Louis, Mo. (Charles S. Evans and Hugh N. Orr, both of San Francisco, Cal., of counsel), for plaintiff.

Eilers & Schaumberg and Albert Chandler, all of St. Louis, Mo., for defendant.

HULEN, District Judge.

By this action plaintiff seeks to restrain defendant from infringement of plaintiff's alleged trademark, "Blindcraft," and from unfair competition. Plaintiff is organized under the laws of the State of California, and has its place of business in the City of San Francisco. It is engaged in the business of manufacturing and selling products, the handiwork of the blind. Defendant is organized under the laws of the State of Missouri, and is engaged in administering aid to the blind in the city of St. Louis and vicinity by providing facilities for the blind to manufacture and sell commodities.

In 1916 plaintiff started to use "Blindcraft" as a trademark, in designating its business, factory, and on labels attached to its product. Its products now consist of "reed and rattan furniture including chairs, settees, tables, jardinieres, lamp bases, standards and pedestals, lamp shades, couches, stands, smoking sets, shoe stands, hat racks, fern boxes and stools; also trays and baskets made of reed, rattan, hemp, wicker or grass; rugs and mats woven, knitted or sewn together and made of cotton, wool, grass, or hemp; brooms, brushes, dusters and mops; and many other similar products." Plaintiff registered the trademark on four different occasions between January 5, 1926, and February 12, 1929. The registrations make no reference to the blind and use of the mark to label their products. In 1923 George Pollard was superintendent of a shop conducted (subsidized) by the Missouri Commission for the Blind in St. Joseph, Missouri, and without knowledge of plaintiff's use of the term, originated the practice of referring to the shop supervised by him as "Blind Craft." By 1927–28, the Missouri Commission for the Blind was using the mark to label articles produced by the blind under its supervision and in shops subsidized by it in Missouri. Between 1923 and 1927–28, the Missouri Commission for the Blind substituted the letter "k" for "c" in the word craft. Defendant corporation was organized in 1934 and use of the mark "Blind Kraft" was then transferred to it by the Missouri Commission for the Blind, and has been continually used by it ever since, on labels attached to the products of the blind, manufactured and sold under its supervision. There has been no interruption in the use of the mark in Missouri since it was originated in the St. Joseph shop in 1923.

Plaintiff's knowledge of defendant's use of "Blind-Kraft" was received in 1939–40 during the Golden Gate Exposition in San Francisco when people from Missouri visited the plaintiff's exhibit and informed the parties in charge that "they had a 'Blind-Kraft' in Missouri." (See testimony of Mrs. Ruth A. Quinan.) There is no other evidence that the sale of products of the blind by plaintiff and defendant have ever come in competition.

Plaintiff's place of business is in San Francisco. The deposition of Charles S. Evans was offered in evidence by the plaintiff. Mr. Evans is a "patent lawyer with offices in" San Francisco and has represented plaintiff in "trademark registrations and various matters of infringement." Mr. Evans testified that "when infringing use of the St. Louis Industrial Aid for the Blind, Inc., was brought to my attention, it was obvious it would be necessary to establish the wide distribution of my client's goods with the trademark used

thereon." Certain memoranda of plaintiff's business were prepared at the request of this attorney, with the object of establishing "the wide distribution of" plaintiff's goods.

Three exhibits were offered, showing shipments of plaintiff's products. They are of interest more because of what they do not show than what they do show. Plaintiff's Exhibit 29 is a list of points to which shipments were made by plaintiff in 1926. This exhibit shows a shipment or shipments to Kansas City and Butler in the State of Missouri. Exhibit 30 is a list of individuals to whom shipments were made "to states east of Nevada from 1926 to 1932, inclusive." (The two shipments to Missouri shown in Exhibit 29 do not appear in this Exhibit.) This exhibit, while showing that plaintiff did make eighty-four shipments of its products over a period of six years east of the state of Nevada, fails to show a single shipment into the state of Missouri, only ten shipments into the state of Kansas in six years, and two shipments into the state of Illinois in six years. Plaintiff's Exhibit 31a is a summary "showing number of purchases shipped by Blindcraft to Missouri and neighboring states February—September, 1939." This was during the San Francisco Exposition. Whether the sales originated from plaintiff's exhibit there does not appear. According to this exhibit there were thirty-three shipments made into the State of Missouri during this period. The record contains no explanation of this method of showing "widespread distribution" of plaintiff's products, prepared at the instigation of plaintiff's attorney for use in this litigation. These exhibits are further of interest in that they fail to show what any shipment contained. Further proof of this phase of the case consists of depositions by C. Ed Hansen and Thomas C. Belton. Mr. Hansen is a hardware jobber located in San Francisco. Mr. Belton is a Department Manager for Baker and Hamilton of San Francisco. Mr. Hansen testified that sale of plaintiff's products through the institution represented by him extended "into eight western states." Asked if the products of plaintiff sold through the jobbing house with which he was connected "go into territory in or bordering Missouri?" the witness stated he did not know, but that they did sell in the states of "Colorado, Wyoming, Nevada, Texas, Arizona, Washington, Oregon, Idaho, Utah, and California." Mr. Belton testified that sales of plaintiff's products by the institution represented by him were to dealers in "Oregon, Washington and Nevada." He could not say if any of the products were shipped into the State of Missouri or neighboring territory.

There is no evidence that the plaintiff ever sold in Missouri or in the central west a single product of the character and kind produced by the blind and sold under the direction and supervision of the defendant. Plaintiff's business during the year 1943 (the record does not show of what it consisted) grossed approximately $200,000, and during the past twenty years has averaged $150,000 gross per year. Defendant's business was estimated at approximately $230,000 gross a year.

The defense, as the case was tried and now presented, is twofold: First, that "Blind Craft" or "Blind Kraft" is a descriptive and generic term and plaintiff can acquire no right to its exclusive use, and second, that defendant was the earlier user of "Blind-Kraft" in Missouri, and surrounding states, and defendant's products do not compete with plaintiff's products.

I. Does the plaintiff have a valid trademark in "Blindcraft?" Or does the word "Blindcraft" fall under the classification of a descriptive term; is it a generic term; and therefore not the subject of monopoly by plaintiff?

By the terms of the statute, "no mark which consists merely in * * * words or devices which are descriptive of the goods with which they are used, or of the character or quality of such goods * * * shall be registered under the terms of this subdivision of this chapter." 15 U.S.C.A. § 85(b).

We approach a decision of the question here presented, mindful that due effect should be given to plaintiff's registration of the mark in question. Such registrations, however, appear to be procedural and not substantive. Pennzoil Co. v. Crown Central Petroleum Corporation, D.C., 50 F.Supp. 891, loc. cit. 898. The adoption of a trademark does not establish its validity. The right to a trademark must grow out of its use. This right has exceptions. One is stated in the case of Parker Pen Co. v. Finstone, D.C., 7 F. 2d 753, loc. cit. 755:

"If a given mark is common to the trade when it is sought to adopt it as a trade-

mark, it is obvious that it can never become a valid trade-mark. If a given mark has been common to a particular trade, it is manifest that by its adoption one cannot claim priority, which is fundamental on the question of exclusive appropriation."

■ The purpose behind the protection of the adoption and use of trademarks is to protect the owners, and users in their respective lines of public relations and to safeguard the consumer by preventing the products of some one else being palmed off on him under a like or similar mark. McGraw-Hill Publishing Company v. American Aviation Associates, 73 App.D. C. 131, 117 F.2d 293. So a trademark, to be protected as such, in the class of cases now before this Court, is usually one which not only designates, but *distinguishes* the particular goods owned and sold by indicating origin or ownership. Another exception, the rule on adoption of descriptive words, is as follows:

"A descriptive word used in its primary sense does not do this and a manufacturer has no right to the exclusive use of any such word which has no relation to the origin and ownership of goods. Delaware & Hudson Canal Co. v. Clark, 13 Wall. 311, 20 L.Ed. 581. A word descriptive of the goods, or some feature or function of them, is not available as a trade-mark. Nims, 3d Ed." Folmer Graflex Corporation v. Graphic Photo Service, D.C., 44 F.Supp. 429, loc. cit. 432.

An examination of decisions of the appellate courts in trademark cases does not show a clear line of demarcation by which general rules can be applied to a particular case, with the result that a mark either stands or falls as legal and subject to protection from infringement, but rather that decision in each case must be based upon the particular facts presented.

In the case of Delaware & Hudson Canal Co. v. Clark, 80 U.S. 311, 20 L.Ed. 581, the Supreme Court had under consideration the words "Lackawanna Coal." In holding that no one could apply the name of a district or country to a well known article of commerce and obtain thereby such an exclusive right to the application as to prevent others of the same district or dealing in similar articles from truthfully using the same designation, the court said (80 U.S. loc. cit. 324, 20 L.Ed. loc. cit. 584):

"And it is obvious that the same reasons which forbid the exclusive appropriation of generic names or of those merely descriptive of the article manufactured and which can be employed with truth by other manufacturers, apply with equal force to the appropriation of geographical names, designating districts of country. Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied. They point only at the place of production, not to the producer, and could they be appropriated exclusively, the appropriation would result in mischievous monopolies.

\* \* \* \* \* \*

"It would greatly embarrass trade, and secure exclusive rights to individuals in that which is the common right of many. It can be permitted only when the reasons that lie at the foundation of the protection given to trade \* \* \* marks are entirely overlooked.

\* \* \* \* \* \*

"True it may be that the use by a *second producer,* in describing truthfully his product, of a name or a combination of words *already in use* by another, may have the effect of causing the public to mistake as to the origin or ownership of the product, *but if it is just as true in its application to his goods as it is to those of another who first applied it, and who therefore claims an exclusive right to use it, there is no legal or moral wrong done. Purchasers may be mistaken, but they are not deceived by false representations, and equity will not enjoin against telling the truth."* (Emphasis added.)

■ Of course, the term "Blindcraft" has no application to the name of a district or country, but blindcraft is just as common to workmanship of the blind wherever they may be as the geographical designation referred to in the coal case. Just as it is "the common right of many" who mine and sell coal from "Lackawanna," honestly so to represent, so also is it the universal common right of the blind to honestly designate their products as the work of the blind. That the term "Blindcraft" does, *and nothing more.* The principle announced by the Supreme Court in the Lackawanna case is even more pointedly stated in Continental Ins. Co. v. Continental Fire Ass'n, C.C., 96 F. 846, loc. cit. 848.

"The word 'continental' is in general and prevalent use, and means pertaining to or

characteristic of a continent. As applied to or designating an insurance company, it would be descriptive of the bounds within which such company carried on its business. The scope of the business carried on by many insurance companies is continental in extent. *A term which can be truthfully used by many in the description of a business or occupation cannot be exclusively appropriated by any one* of them. The word 'continental' is a generic term, and it is not the policy of the law to permit the exclusive appropriation of words or terms which are generic; *that is, which pertain to a class of related things, and which are of general application.* The right to use such words should remain vested in the public." (Emphasis added.)

In citing these cases, where commercial institutions have attempted to monopolize a name indicating a place from which a product comes, which could with equal honesty be common to many others, we are attempting to call attention to the fact that "Blindcraft" on a label of a product indicates a class of people from which the product comes—a source common to many in the same sense that a geographical location may be common to many. Note the following language from the case of Van Camp Sea Food Co. v. Cohn-Hopkins, 9 Cir., 56 F.2d 797, loc. cit. 798, where the mark "Chicken of the Sea" was held to be a purely descriptive title and in its primary sense not the subject of a valid trademark:

"It indicates the place from which the product comes, and to that extent is descriptive in the same sense that any geographical term is descriptive. It is peculiarly so as applied to a product coming from the 'sea." Certiorari denied 286 U.S. 561, 52 S.Ct. 643, 76 L.Ed. 1294.

In Connell v. Reed, 128 Mass. 477, 35 Am.Rep. 397, it was held that the words "East Indian" in connection with the word "remedy" placed upon bottles of medicine were not the subject of a trademark. That the rule now under discussion is not confined to geographical terms is indicated by the following cases:

In American Brewing Company v. Bienville Brewery, C.C., 153 F. 615, the word "Bohemian" was held not subject to monopoly as a trademark. The following observation of the Court might well be applied to the facts of the present case (loc. cit. 617):

"I am of opinion from the evidence now submitted that the term 'Bohemian' thus used *does not point distinctly to the origin, manufacture, or ownership of the article on which it is stamped and to distinguish it from like articles manufactured by others,* but that it is so placed to identify the class or quality of the article, and that it is not capable of becoming a valid trademark and cannot be sustained as such." (Emphasis added.)

In Parker Pen Company v. Finstone, supra, the trademark consisted of a body shape and color combination of a fountain pen. The trademark was held invalid.

In Humphreys' Specific Homeopathic Medicine Co. v. Wenz, C.C., 14 F. 250, loc. cit. 253, the Court held that "homeopathic specifics" standing alone could not be appropriated as a trademark. Note the language used, which again we observe is equally applicable to the case under consideration:

"It cannot be successfully maintained that the words 'homeopathic specifics,' standing alone, can be appropriated by any one as a trademark; they are too broad, and if allowed would give the taker a monopoly in a school of medicine which Hahnemann, its founder, threw open to all disciples.

\*  \*  \*  \*  \*  \*

"The name can no more be appropriated, and is no more the property of Humphreys, than any other practitioner of the homeopathic system of therapeutics."

The word "graphic" was held descriptive in the case of Folmer Graflex Corporation v. Graphic Photo Service, D.C., 44 F.Supp. 429. A like ruling was made in the case of In Re Swan & Finch Co., 49 App.D.C. 94, 259 F. 990, in considering the term "Textul." The words "College Humor" were held invalid as a trademark in Collegiate World Pub. Co. v. Du Pont Pub. Co., D.C., 14 F.2d 158. There the Court used practically the same language as was used by the Supreme Court in holding terms representative of geographical locations invalid as trademarks. We quote from the Collegiate World Publishing Company case, loc. cit. 161:

"A name that is merely descriptive of the qualities or composition of an article, *and the primary meaning of which others may employ with equal truth, for the same purpose, cannot be monopolized as a trademark.* Beckwith v. Commissioner of Pat-

ents, 252 U.S. 538, 40 S.Ct. 414, 64 L.Ed. 705; Warner [& Co.] v. Lilly [& Co.], 265 U.S. 526, 44 S.Ct. 615. 68 L.Ed. 1161; Standard Paint [Co.] v. Trinidad [Asphalt Mfg. Co.], 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed. 536; Elgin [Nat. Watch Co.] v. Illinois [Watch Case Co.], 179 U.S. 665, 21 S.Ct. 270, 45 L.Ed. 365; Brown [Chemical Co.] v. Meyer, 139 U.S. 540, 11 S.Ct. 625, 35 L. Ed. 247; Photoplay [Pub. Co.] v. La Verne [Pub. Co.], 3 Cir., 269 F. 730." (Emphasis added.)

The term "Photoplay" was held "purely descriptive of the art" and not a term that could be exclusively appropriated as a trademark in Photoplay Pub. Co. v. La Verne Pub. Co., Inc., et al. 3 Cir., 269 F. 730. It was held in Warner Publication, Inc., v. Popular Publications, 2 Cir., 87 F. 2d 913, that the words "Ranch Romances" did not constitute a valid trademark. "Fashion Knit" as applied to knitted articles was held descriptive and not a valid trademark in the case of Franklin Knitting Mills, Inc., v. Fashionit Sweater Mills, Inc., D.C., 297 F. 247, 248, affirmed 2 Cir., 1925, 4 F.2d 1018. Referring to the union of the word "fashion" and "knit", · the Court said that the words "being made up of two words of common use, necessarily carries over into their conjunction the meaning of each."

■ The misspelling of the word "craft" as used by the defendant in its mark "Blind-Kraft" does not, in our opinion, affect this case one way or the other. Chicago Pneumatic Tool Co. v. Black & Decker Mfg. Co., 39 F.2d 684, 17 C.C.P.A.Patents, 962.

■ The record in this case shows that the term "Blind Craft" was used in Canada, Massachusetts, New York, Missouri, and California, in designating products of the blind. There is no evidence that either had knowledge of the use of the term by the other. There is evidence that the origin of the term "Blind-Kraft" in Missouri was wholly independent of its use by anyone else. Even in the State of California, as late as 1939, the "Industrial Home for the Blind in Oakland," which we assume is located in Oakland, across the Bay from San Francisco, started to use the term "Blindcraft." In a letter by Mr. Evans, Attorney for the plaintiff in this case, to the Attorney General of the State of California, on January 7, 1939 (plaintiff's Exhibit 35a) counsel for the plaintiff stated:

"It may be assumed that the adoption of this name by the state institutions was in ignorance of my client's prior ownership. * * *" The use of a name "by another to truthfully describe his own product does not constitute a legal or moral wrong * * *." Warner & Co. v. Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 616, 68 L.Ed. 1161.

Plaintiff cites the case of Henry Muhs Co. v. Farm Craft Foods, D.C., 37 F.Supp. 1013, 1014, in support of the legality of the mark here in question. In the Muhs case the District Court held "Farm Craft" the subject of a legal trademark. Neither of the parties to that case were operating farms, but were corporations—"in the business of packing, manufacturing and selling food products." The holding of the Court is to the effect that "Farmcraft" is an arbitrary word (loc. cit. 1015):

"The validity of the term Farmcraft as a trade-mark is attacked as descriptive because both the words Farm and Craft are said to be general terms and available to the public. But the combination of two descriptive components into a single coined, arbitrary and fanciful word may be a perfectly valid, technical trade-mark. The term must be considered in its entirety. The word Farmcraft does not describe cheese nor any of the other products to which the plaintiff applies the term. At most it is a suggestive term."

The word "craft" is not an uncommon one, whether standing alone, or as a suffix attached to another word. "Craft" defined by Webster in the New International Dictionary, Merriam Reference History Edition (1929), p. 523, has almost a dozen meanings. In the sense in which "craft" is used in this case, one of these meanings is applicable. The *primary* use of the word, a noun, is "art or skill; dexterity, as in some manual employment". and, immediately following in Webster's definition of this meaning, as illustrative of further usage "an occupation or employment requiring this (craft)." Webster further states that "craft" may be used as "a suffix denoting art, skill, trade; as in witchcraft, priestcraft, statecraft, watercraft, etc." It is clear that "craft" employed as a suffix lends its own peculiar connotations of skill and dexterity to the word with which it is joined. In each instance, in its primary sense, and as used in this case, the element which craft adds to the word preceding is skill or deftness in using or

working with or upon, or employed in general relation to the subject to which the suffix is attached.

The instantaneous effect which the word "Blindcraft" leaves is the suggestion of dexterity and skill of the blind as well as their handiwork itself. Research in psychology, as well as common observation, has disclosed that those who have lost their sight, or those in whom the sense has been impaired, have been compensated by an increased dexterity in using their hands.[1] The word "Blindcraft," when contrasted with other craft suffix words denoting skill in some field, the only distinction would appear to lie in the unusually broad area covered by the word "Blind," i. e. "Blindcraft" conveying the idea of the blind performing deftly at any of the various skills or trades to which their talents are applied. "Blindcraft," therefore, contains within itself no inherent contrariety or inconsistency. It is a consistent, natural descriptive term identifying in a broad sense, work of the blind. "Farmcraft," on the other hand, is of a different nature. Webster, in defining "craft" under the term "trade" declares, in comparing "craft" with other synonyms, that "Craft"—"denotes esp. a trade requiring skilled workmanship, as a carpenter, bricklayer, blacksmith (not farmer, gardener)" (parentheses are Webster's). "Farmcraft" is artificial, not descriptive, as the District Court found—a tie of two entirely different words which have no natural but only a forced association. Compare "Factory Craft," "City-Craft," "Desert Craft," et cetera. In reference to the law of trademarks, this conflict is not a handicap, but quite the contrary. In the case of "Blindcraft," the very natural blending of the terms is a factor fatal to its right to exclusive trade mark use, in its primary sense. It is too broad a term to permit of monopoly.

█ It may be contended that "Blindcraft" symbolizes essentially the work or contrivances of the blind rather than the skill with which such work is produced, and therefore since such goods cannot be blind, that "Blindcraft" is inconsistent from the standpoint of word structure, and is therefore fanciful and entitled to protection as in the "Farmcraft" case. However, as has been mentioned, Webster defines "craft" in the primary use of the word in the sense of manual skill and dexterity, whereas "craft" in the sense of work produced is a secondary meaning. The parties to this case are using the word "craft" in its primary and usual meaning. Neither of plaintiff's registrations and many of its ads and labels do not make any other reference to the fact that plaintiff's products are work of the blind—depending on the mark solely to so inform the public. Goods made by the blind, placed on the shelf, are indistinguishable, on casual glance, from goods made by those with sight. Just as "handmade" denotes a certain excellence, ordinarily, above that of manufactured goods, the word "Blindcraft" distinguishes the goods to which it is attached by imparting the association of the skill, in spite of handicap, of their maker. Also many people, no doubt, buy goods marked "Blindcraft" because the goods are made by the blind, and the charitable motive in such an instance would predominate. Plaintiff, in most instances, does not include any additional words on its labels, to convey the meaning that the article is the work of the blind. "Blind (person's) craft," in the sense used by plaintiff and defendant, would universally and commonly mean to the public generally that which is produced by the blind, and in view of this there is no conflict between the two terms as in "Farmcraft." The word or words "Blindcraft" as applied to products of the blind is a generic term. It applies to a class, related things, a group national in scope and confined to no locality. No blind person should be deprived of its use to truthfully inscribe his products. To grant a monopoly to any one group of the blind, in their use, in putting their products before the public would be unfair to other blind groups. "Blindcraft" or "Blind-Kraft" is synonymous with craftsmanship of the blind. The marks used by

---

[1] Thus, it is said in The Encyclopedia Americana (1903) Vol. 3, in the Article "Blind": "The other senses of persons who have been blind for a long time, become more exquisite, perhaps, because they are not subject to the distraction produced by the sight of so many objects. The blind, therefore, are often distinguished for a remarkable mental activity, and a wonderful development of the intellectual powers. Their touch and hearing, particularly, become very acute." The article on "Education of the Blind" cites the handicrafts of chair-caning, hammock-making, broom-making, and carpet weaving as trades taught at one time or another in our schools for the blind.

1002

plaintiff and defendant, when used and applied as shown by the facts in this case, can mean but one thing, that the article to which the mark is applied is the product of the blind. Any prospective purchaser of the products of the institutions operated by either plaintiff or defendant, on seeing the word "Blindcraft" or "Blind-Kraft" would conclude, without more information, that the article was the work of the blind. The mark would not convey a particular origin as to ownership or product, but a common origin from a class, a class unfortunately common to every section and state in the Union. The words "Blindcraft" or "Blind-Kraft" could in honesty be applied by any blind person in any locality in designating his handiwork. "Blindcraft" is not the subject of monopoly as a trademark when used in its primary sense. There is no evidence in this case that "Blindcraft" as used by the plaintiff has taken on a secondary meaning. Plaintiff had the burden to prove that the mark used by them had taken on a secondary meaning. Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 6 Cir., 1916, 235 F. 657.

II. The law governing defendant's second position, as we understand it, is stated in the case of Esso, Inc., v. Standard Oil Co., 8 Cir., 1938, 98 F.2d 1, loc. cit. 6, as follows:

"The owner's right to have his trademark protected is coextensive only with the territory throughout which it is known and from which it has drawn its trade. He is not entitled to protection in advance of the extension of his trade. It must be constantly borne in mind that the mark in the abstract is of no significance, but is auxiliary to and inseparable from the good will of its possessor, and it exists only as an incident of the business in which it was acquired and with which it remains identified. As between conflicting claimants to the right to use a name or mark, *priority of appropriation* implies more than priority in employment of the mark. *It means that he who first employed the mark in a particular market has the better right in that market. A subsequent user and appropriator who has in good faith adopted and used the mark in territory into which goods of the first appropriator have not been used or sold, is entitled to protection against the first appropriator of the mark."* (Emphasis added.)

Also applicable to defendant's claim is the rule found in the opinion of the Supreme Court in the case of Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, loc. cit. 361, 60 L.Ed. 713, loc. cit. 719:

"In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question. But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, *the question of prior appropriation is legally insignificant;* unless, at least, it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like." (Emphasis added.)

To the same effect is the ruling of the Circuit Court of Appeals for the Eighth Circuit. See Sweet Sixteen Co. v. Sweet "16" Shop, 15 F.2d 920, 923.

" * * * the general rule is that, while the first appropriator and user of a trademark owns such mark and is entitled to protection by the courts in the use thereof, against subsequent users on the same class of goods, such protection will not be afforded *as against a subsequent user and appropriator, who in good faith adopts* and uses the mark in territory into which the goods of the first appropriator have not penetrated and have not been used or sold. (Emphasis added.)

* * * * * *

" 'That the right to protection in the exclusive use of a trade-mark extends only to those markets where the trader's goods have become known and identified by his use of the mark; * * *.' "

"Blindcraft" under the facts of this case would not be classed as a technical trademark. As we view the record in this case, there is no dispute as to the use made by the parties of the words "Blind Craft" or "Blind Kraft." Although defendant and its predecessors or assignors have been using the mark in Missouri since 1923, there has been no conflict in the sale of plaintiff's and defendant's products. Plaintiff admittedly obtained its information of the use of the mark by defendant, *not through trade channels,* but at the exposition in San Francisco in 1939–40. As we view the evidence, each of the parties was using the mark in the respective terri-

tories served by them during the period referred to and neither party was using the mark in the market of the other. Plaintiff's witness, Mrs. Quinan, President and General Manager of the San Francisco Association for the Blind, being asked, "Do you know of any confusion which has arisen by the use of the defendant, Industrial Aid for the Blind, Inc., of the label bearing the mark "Blind Kraft?", related the experience at the Golden Gate Exposition *and gave no instance of any other or further confusion in the use of the mark by plaintiff and defendant.*

There is evidence of plaintiff having made some shipments into Missouri and surrounding states, but it is meager and not substantial. There is no evidence of plaintiff having met competition from defendant in Missouri or surrounding states. It is our opinion that a proper deduction from the evidence offered as to shipment by plaintiff of its products into Missouri and surrounding territory that while it may have operated to some degree in the territory of the defendant, yet on this record we must find that neither the plaintiff nor defendant to any substantial degree invaded the other's commercial or market territory. Plaintiff does not challenge the good faith of defendant, its predecessors or assigns, in their adoption of the mark. The mark having been used in Missouri in connection with the products of blind workers for some fourteen years, innocent of plaintiff's use of the mark in the western states, this use must have established some reputation in Missouri. This is indicated by visitors to the Golden Gate Exposition, on seeing plaintiff's exhibit, declaring "they had a Blind Kraft in the State of Missouri." To enjoin defendant from further use of the mark in Missouri, assuming that plaintiff would invade in a substantial way the Missouri territory, would permit the plaintiff to preempt the good will of defendant built up in Missouri and the territory served by the defendant, in the mark. In Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, loc. cit. 361, 60 L.Ed. 713, loc. cit. 719, the Supreme Court said:

"That property in a trademark is not limited in its enjoyment by territorial bounds, but may be asserted and protected wherever the law affords a remedy for wrongs, *is true in a limited sense.* Into whatever markets the use of a trademark has extended, or its meaning has become known, there will the manufacturer or trader whose trade is pirated by an infringing use be entitled to protection and redress. *But this is not to say that the proprietor of a trademark, good in the markets where it has been employed, can monopolize markets that his trade has never reached, and where the mark signifies not his goods, but those of another.* We agree with the court below * * * that 'since it is the trade, and not the mark, that is to be protected, a trademark acknowledges no territorial boundaries of municipalities or states or nations, but extends to every market where the trader's goods have become known and identified by his use of the mark. But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article.'" (Emphasis added.)

See also ruling of the same court in United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, loc. cit. 52, 63 L.Ed. 141, loc. cit. 147:

"It would be a perversion of the rule of priority to give it such an application in our broadly extended country that *an innocent party who had in good faith employed a trade-mark in one state, and by the use of it had built up a trade there, being the first appropriator in that jurisdiction, might afterwards be prevented from using it, with consequent injury to his trade and good will,* at the instance of one who theretofore had employed the same mark, but only in other and remote jurisdictions, upon the ground that its first employment happened to antedate that of the first-mentioned trader." (Emphasis added.)

That plaintiff's business after a quarter of a century, in the entire nation, amounts annually to approximately $200,000 gross, does not justify the conclusion that the business of plaintiff will expand into the territory of the defendant in the near future.

"In order that a trade-mark be established as appurtenant to a business in a particular area, there must be an actual occupation of the market by that business. * * * It is not clear that to make *a few spasmodic sales,* such as were made by the plaintiff in the instant case after repeal of the Eighteenth Amendment, is sufficient." J. A. Dougherty's Sons v. Kasko Distillers Prod. Corp., D.C.E.D.Pa.1940, 35 F.Supp. 561, loc. cit. 564. (Emphasis added.)

Plaintiff's experience at the San Francisco Exposition, of people from Missouri de-

claring "that they had a 'Blind-Kraft' in Missouri," indicates that to now enjoin defendant from use of the mark and thereby award to plaintiff defendant's territory in use of the mark would result in confusion. What the Court said in the case of Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 361, 60 L.Ed. 713, loc. cit. 719 is applicable:

"If the symbol or device is already in general use, employed in such a manner that its adoption as an index of source or origin would only produce confusion and mislead the public, it is not susceptible of adoption as a trademark."

For many years plaintiff and defendant have simultaneously used the same mark for their respective products, one in the California and western territory, and the other in Missouri or Central territory, without competing, appearance of confusion, or conflict. Neither evidences the will, ability or power to substantially invade, now or in the near future, the market of the other. Of necessity their products are limited as the number of blind workers are limited. Plaintiff is not entitled to enjoin defendant from use of the mark in the commercial territory served by it.

Plaintiff's bill will be dismissed. Let finding of fact, conclusion of law and decree be submitted.